UNITED STATES of America
v.
Elvin Lee BYNUM et al., Defendants.
No. 71 Cr. 1169 (MP).

United States District Court,
S. D. New York.

Dec. 5, 1974.

Paul J. Curran, U. S. Atty., S. D. N. Y., by W. Cullen MacDonald, Asst. U. S. Atty., for plaintiff.

Henry J. Boitel and Bernard J. Hasson, New York City, for defendant Bynum.

Patrick M. Wall, New York City, for defendants Cordovano, Wright, Small, Mitchell, Garnett, and Dyson.

H. Elliot Wales, New York City, for defendants Coniglio, Meli and Tuzzolino.

Frank Lopez, Brooklyn, N. Y., for defendant Altamura; by Salvatore Canonico, Brooklyn, N. Y., of counsel.

Morrow D. Mushkin, Garden City, N. Y., for defendant Birnbaum.

Amedeo Lauritano and Joel Winograd, New York City, for defendant Feroldi.

Levis Nedd, pro se.

## OPINION AND FINDINGS

POLLACK, District Judge.

The defendants herein were convicted by a jury of violations of the narcotics laws with the use on the trial of wiretap evidence. A motion to suppress the intercepted conversations was denied by the District Court and the issue was raised on appeal from the convictions. Before deciding the merits of the appeal, the Court of Appeals remanded the case for a hearing on whether minimization of the wiretap surveillance was properly observed. 475 F.2d 832 (2d Cir. 1973). The District Court found and reported that the minimization measures taken were appropriate under the circumstances, 360 F.Supp. 400, and the Court of Appeals affirmed these findings and affirmed the convictions in all respects. 485 F.2d 490 (2d Cir. 1973). The defendants then sought certiorari from the Supreme Court raising among other points the contention that the authorization for the wiretaps by the Attorney General was defective in that a judicial order granting further time for the wire surveillance had not received the personal approval of the Attorney General.

During pendency of the application for certiorari herein, the Supreme Court decided United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), upholding the grant of a pretrial motion to suppress wiretap evidence where an original intercept order lacked the pre-application personal approval of the Attorney General and an order based thereon had extended the time limit of the intercept authority, and United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974), in which pre-application personal approval was in fact given to the original order by the Attorney General but the papers erroneously had attributed the approval to a specially designated assistant and this was held not to invalidate the wire tap order.

Without reaching the merits of defendants' contentions herein (Mr. Justice Douglas dissenting and voting to reverse), the Supreme Court vacated the judgment in this case and remanded it to the Second Circuit Court of Appeals for further consideration in light of *Giordano* and *Chavez*. United States v. Bynum, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). On motion of the government, the Court of Appeals in turn remanded the case to this Court on June 18, 1974 for a hearing and consideration of evidence in light of *Giordano* and *Chavez*.

A hearing was duly held at which the testimony of former Attorney General, John Mitchell, and his assistant, Sol Lindenbaum, was adduced, together with evidence tending to show that the four challenged conversations used on trial must be considered of immaterial effect on the convictions. At the close of the hearing on November 9, 1974, the government suggested that it might consider calling two additional witnesses to testify on the effect of the questioned interceptions, but the Court concluded that such testimony would be unnecessary at this time in view of the limited remand under which this Court does not reach the question of the effect of those interceptions in obtaining the convictions. The parties thereafter submitted briefs and due deliberation has been had.

The fact which at once sets this case apart from *Giordano* is that here the *initial* wiretap orders did have the pre-application personal approval of Attorney General John Mitchell. This satisfied all requirements of Title III, 18 U.S.C. § 2515 et seq. Moreover, since all the orders involved herein were based on probable cause, as defendants have conceded, the orders were therefore lawful under the Fourth Amendment.

Briefly,[1] the facts herein are that three wiretap orders (two initial and one extension) were made authorizing interception of communications on residential telephone facilities located in a private single family dwelling at 855 Linden Boulevard, Brooklyn, for which the subscriber was Fred[2] Garnett. The object of the surveillance was the narcotics activities of Elvin Bynum and his cohorts. Two telephone numbers were assigned to these phone facilities, viz., (212)342–6203 and (212)346–5992. Both of these were in the premises before

the initial wiretap order was made on January 29, 1971 by Judge Travia. The second number had been added by the phone company without the knowledge of the government agents while they were preparing and submitting the application to the Attorney General and the Court for their respective approval and authorization.

The chronology is as follows:

On January 14, 1971, the agents of BNDD commenced preparation of an application for surveillance of Bynum's narcotics activities at 855 Linden Boulevard by interception of the telephone communications flowing in and out of the premises and by a bug to be planted in the premises. The application was presented to the Attorney General who personally approved it on January 26th. The application mentioned that the phone facilities bore number (212)342–6203. Unknown to the government the subscriber, Fred Garnett, ordered installation of a second phone facility on January 26th and it was installed and operative on January 28th. On January 29th Judge Travia issued the original wiretap order for interception during the 20 day period expiring on February 18, 1971 (H 603).

Learning of the second phone installation, the government prepared a further wiretap application which was presented to the Attorney General who personally approved it on February 11, 1971. The application mentioned that the phone facilities to the premises now included number (212)346–5992. On February 12th Judge Travia issued his second wiretap order (H 639) relating therein the number of the added telephone facility; this similarly authorized interception for a period not to exceed 20 days expiring on March 3, 1971.[3]

1. The page number references in this opinion are as follows: an "A" prefix indicates the Second Circuit appendix on the initial appeal following trial (the white volumes); an "H" prefix indicates the Second Circuit Appendix following the minimization hearing before this Court (grey volumes); and a "C" prefix indicates the transcript of the hearings held before this Court on the present remand. "PA" references are to the hearing exhibits.

2. Fred Garnett was in fact Mae Garnett, a defendant in this case living with Elvin Bynum, the principal defendant.

3. Both the January 29th and February 12th orders authorized installation of a bug to obtain conversations from within the premises

On February 18, 1971, Assistant United States Attorney Updike submitted to the Department of Justice an application he proposed to lay before Judge Travia for his authorization of an extension of the time limit of the January 29th order. The Attorney General was absent from Washington on that date and since the proposed time enlargement was within the approved objective, his assistant Sol Lindenbaum authorized AUSA Updike to present the application to Judge Travia who thereupon issued his order of February 18th (H 681) enlarging the time limit of the January 29th order for an additional 14 days so that the expiration of the allowable intercept period under the orders of February 12th and 18th would occur on the same day, March 3, 1971.[4]

The defendants contend that communications intercepted between February 18th and March 3rd over telephone line (212)342–6203 or the investigative fruits thereof were improperly admitted into evidence at trial because Attorney General Mitchell did not personally approve on February 18, 1971 the submission to Judge Travia on that date of the application to enlarge the time limit for inteception fixed in the Court's order of January 29, 1971.

*Burden of proof*

In United States v. Magaddino, 496 F.2d 455 (2d Cir. 1974) the Court of Appeals of this Circuit set out the rule for burden of proof on the question of the illegality of wiretaps where defendants seek to suppress the evidence obtained therefrom. Quoting Alderman v. United States, 394 U.S. 165, 89 S.Ct.

961, 22 L.Ed.2d 176 (1969), which in turn refers to Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939), the Court stated at 496 F.2d 459–460 that "the 'burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed.'" *Accord,* United States v. Covello, 410 F.2d 536, 548 (2d Cir. 1969), cert. denied, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969), reh. denied, 397 U.S. 929, 90 S.Ct. 897, 25 L.Ed.2d 110 (1970); *cf.* United States v. Morin, 378 F.2d 472, 475 (2d Cir. 1967).

The defendants have failed to prove that wiretapping was unlawfully employed herein.

*Summary of findings*

This Court finds that Attorney General Mitchell was not under legal obligation to personally function on February 18, 1971 on the application to enlarge the time limit for authorized interception set out in the Court's order of January 29, 1971. The continued interception of communications over the telephone with the listing (212)342–6203 during the period February 18 to March 3, 1971 violated neither the Fourth Amendment nor Title III and neither *Giordano* nor *Chavez* is applicable to the facts here present. There is therefore no legal requirement for suppression of the evidence used at trial as will more fully be shown hereafter.

The Court's conclusion that there was no invalidity in the wiretapping may be based on alternative grounds. *First:* former Attorney General Mitchell's per-

---

at 855 Linden Boulevard, but BNDD agents were never able to plant it. See the February 12, 1971 Affidavit of Thomas Taylor, para. 14, H652, H657 and AUSA Updike's March 8, 1971 letter to Judge Travia (H724–25).

4. Interception of communications which took place over the telephone listed as (212) 342–6203 commenced on January 30, 1971 at 9:30 a. m. and continued through February 17, 1971 at 11:50 p. m. when the tap was shut down. The tap was reactivated at 4:35 p. m. on February 18th and terminated on

March 3, 1971 at 11:58 p. m. (Letters of AUSA Updike to Judge Travia, February 4, 1971, H635; February 24, 1971, H718–19; and March 8, 1971. H724–25). Interception of communications which took place over telephone line (212)346–5992 commenced on February 13th at 7:30 a. m. and terminated on March 3rd at 11:57 p. m. (Letters of AUSA Updike to Judge Travia, February 18, 1971, H679; and March 8, 1971, H724–25). Interception of communications over both lines was frequently interrupted by technical difficulties.

sonal approval on January 26, 1971 of the application for a wiretap on the original phone was the only action on his part that was required by Title III with respect to that phone no matter what portion of the statutory time limits the judge decided to allow for the interception. The statute, 18 U.S.C. § 2518(5) permits a time limit of 30 days for an original order authorizing a wiretap. This time limit may be extended for up to another 30 days by the Judge supervising the tap. *Id.* The ultimate duration of the wiretap on the phone was in the discretion of the judge issuing the original order, subject to the requirement of continuing probable cause on which he must be satisfied. Judge Travia made the requisite probable cause findings with respect to the original phone facility on January 29, 1971 and again 20 days later on February 18, 1971 when he extended the viability of his original order for another 14 days.

*Second:* the two telephones were subscribed for in the same name (Fred Garnett), located in the same private residential one family premises, and used by the same individuals for the same illegal purposes; consequently they may be considered to be in effect a single or common unit, and in light of the circumstances, including his action on January 26th, Attorney General Mitchell's personal approval on February 11, 1971, in effect authorized whatever Court applications were necessary to accomplish the approved objective, which certainly included interception of all communications over all residential phone facilities in the premises during the period February 12 to March 3, 1971. Thus on this alternative, the proposed application to Judge Travia for the February 18, 1971 enlargement of the time limit for interception on the original facility was in effect approved personally by Mitchell on February 11, 1971, rather than improperly approved by Lindenbaum on February 18, 1971.

Similarly, since the two telephones were subscribed for in the same name,

located in the same private residential one family premises, and used by the same individuals for the same illegal purposes, they may be considered to be in effect a single or common unit. Thus Attorney General Mitchell's personal approval on February 11, 1971 considered in light of all the circumstances, including his personal approval of the objective given on January 26, 1971, in effect authorized whatever application was necessary to pursue interception of communications over both telephones during the period February 12, 1971 to March 3, 1971, and the February 12, 1971 order *itself* in effect granted authority for a tandem or simultaneous tap on both phones. The February 18, 1971 order was thus a legally unnecessary but proper alignment of the paper record since the time limit expressed in the January 29, 1971 order was 20 days which would expire on February 18th so far as that order is concerned. In addition, in the February 18, 1971 order Judge Travia updated for telephone number (212)342-6203 the probable cause findings implicit in the February 12. 1971 order as construed above.

The Court's concern here must be in safeguarding the purposes and principles behind Title III and the substance of the authorizations and the adequacy of the warrants issued to effect those purposes and authorizations. The form of the paperwork utilized is not the criterion to be followed; the substance is the critical consideration. No valid issue of unauthorized invasion of privacy is present or at stake and none collides here with the public interest. *See generally* United States v. Poeta, 455 F.2d 117, 121 (2d Cir.), cert. denied, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972) (inadvertent crossing out of provision that authority would not terminate with first interception); United States v. Bridges, 419 F.2d 963 (8th Cir. 1969) (common sense reading of affidavit to support finding of probable cause); State v. Bisaccia, 58 N.J. 586, 279 A.2d 675 (1971) (misidentification

of house number because agent thought numbers ran in one direction rather than the other).

## I.

*Giordano* has tersely stated the applicable statutory rule. "The orders themselves must particularize the extent and nature of the interceptions that they authorize, § 2518(4), and they expire within a specified time unless expressly extended *by a judge* based on further application by enforcement officials. § 2518(5)." (Emphasis added). 416 U.S. at 514–515, 94 S.Ct. at 1826. After providing that an initial wiretap order may authorize interception of wire communication, but in no "event longer than thirty days" the statute reads that

> Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. *The period of extension shall be no longer than the authorizing judge deems necessary* to achieve the purposes for which it was granted and in no event for longer than thirty days. (Emphasis added). 18 U.S.C. § 2518(5).

■ Attorney General Mitchell's approval on January 26, 1971 of the objective to be obtained by wiretap and by planting of a bug in the premises was the only action on his part that was required by Title III with respect to the original phone installation since the time factor involved in reaching the objective was a matter of continuing probable cause to be supervised and determined by the judge issuing the order; enlarging or shortening the time limit was discretionary with the judge under all the relevant facts and circumstances.

Title III largely tracks the probable cause and particularity of description requirements imposed by the Supreme Court in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The innovative element in Title

III concerns the requirement in § 2516(1) that the Attorney General or his specially designated Assistant Attorney General approve wiretap applications prior to their submission to a judge. The intent of this requirement was to place the responsibility and accountability for the formulation of law enforcement policy on the use of electronic surveillance measures in a publicly responsible office subject to the political process. S.Rep. No. 1097, 1968 U.S. Code Cong. & Admin.News, pp. 2185, 2189. The Attorney General is to assure that the statutory wiretap authority available in Title III is used with restraint and not routinely invoked. United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

■ On this basis, Attorney General Mitchell properly approved the application for electronic surveillance authority on January 26, 1971. Both the Lindenbaum (PA7) and Criminal Division (PA4) memos of January 26, 1971 indicated to Mitchell that a major narcotics conspiracy extending to Virginia, Massachusetts, and the District of Columbia as well as the metropolitan New York area was involved. The Lindenbaum memo also indicated that the BNDD had set up a special unit to handle the investigation due to the problem of Bynum's possible corruption of BNDD agents, as well as New York City police and district court officials. The fact that a major narcotics distribution conspiracy as well as likely bribery of public officials was involved amply supports the conclusion that resort to Title III was neither routinely invoked by the BNDD nor routinely approved by Mitchell personally on January 26, 1971.

The statute does not call for this same personal review function by the Attorney General prior to a request to the Court for further time to conduct the interception previously approved. There is no logical reason for requiring such personal review when the question is merely *how long the wiretap should last*. Whether there should be a wiretap is the function that Congress placed in the

hands of the Attorney General—to be performed personally. The *time limit* is keyed to probable cause—a function of judicial review—not to authorization by the Attorney General. The governing provision on extensions, § 2518(5) simply indicates that an application to grant additional time for an authorized interception must comply with requirements set forth in 18 U.S.C. § 2518(1) which merely requires in the connection under discussion that the papers should name the authorizing official. Here the official who authorized the interception was Mitchell and the papers so stated. There is no requirement apart from the initial approval of wire interception, for personal authorization by the Attorney General of time limit adjustments. Section 2516 itself which places responsibility on the Attorney General makes no reference to adjustment of the time limit of the authorization or to extension applications other than to refer the reader to section 2518 for the outermost periods for interception of 30 and 30 days and to the Judge for the grant of an extension of time within those limits.

■ Once the interception of wire communications has been initially authorized, the crucial element in assessing whether and how long the interception should continue is that of probable cause. Determinations of whether or not probable cause exists are the particular province of the judge or magistrate, and the Attorney General's conclusions as to whether or not there is probable cause in the history of the tap to date and in the request for more time is in no way binding upon the judge, nor would the Attorney General's conclusions thereon permit a judge to determine that probable cause exists without reviewing the underlying affidavits of the investigating field agents. *See* United States v. Chavez, 416 U.S. 562, 574 n.5, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Thus an individual is protected from the granting of an abusive continuance or extension of the time limit given in an originally valid intercept order by the judge's review of the element of continuing probable cause.

Although not required to do so, pursuant to his discretionary authority under 18 U.S.C. § 2518(6), Judge Travia incorporated a provision in his January 29, 1971 order which required AUSA Updike to file reports on the progress of the wiretap on the fifth, tenth, and fifteenth days following entry of the order. Updike submitted three such reports by letters dated February 4, 1971 (H635), February 8, 1971 (H637), and February 16, 1971 (H677). AUSA Updike also communicated information orally to Judge Travia on the progress of the wiretap. At the time when Judge Travia made his updated findings of probable cause with respect to the original phone on the premises on February 18, 1971, he had before him the affidavit of Agent Taylor which summarized the more significant narcotics related calls intercepted during the period January 30 to February 18, 1971. Judge Travia's February 18, 1971 time extension contained a similar provision with respect to the filing of interim reports on the progress of the wiretap. During the period January 30 to March 3, 1971, AUSA Updike forwarded copies of the intercept logs on a regular basis to Judge Travia at his request.

Thus both Attorney General Mitchell and Judge Travia properly performed their statutorily mandated review functions in this case, Mitchell in approving the initial application for wiretap authority in advance of Court submission thereof in a case clearly justifying its use and Judge Travia by controlling the time limits and periodically reviewing the progress of the wiretap and the continued presence of probable cause under both his January 29 and February 18, 1971 orders.

## II.

■ As an alternative basis which sustains the regularity of the interceptions complained of herein, this Court finds that Attorney General Mitchell's

personal approval on February 11, 1971 of the application about to be submitted to Judge Travia authorized whatever further applications to the Court that might be deemed necessary for authority to intercept communications during the period February 12, 1971 to March 3, 1971 over the private residential telephone service subscribed for in the name of Fred Garnett. Thus application for the February 18, 1971 order extending the time for the interception of communications over phone facility (212)342–6203, which was originally provided by the January 29, 1971 order, was personally approved by the Attorney General on February 11, 1971, and the action taken by his Executive Assistant on February 18, 1971, was both unnecessary and irrelevant to the issue of the Attorney General's personal authorization in this case.

This conclusion is based on four propositions. *First,* since the two telephone facilities were both located in the same premises, both calling for residential service, subscribed for in the same name, and used by the same persons for the same criminal purposes, they were in effect a single or common unit. *Second,* the government officials in the field intended to establish a tandem tap by which interception of wire communications over both telephone facilities would proceed and terminate concurrently. *Third,* the references to phone number (212)346–5992 in the supporting papers and in Mitchell's February 11, 1971 memo to Will Wilson may be treated as unnecessary surplusage or irrelevant omission of the other number when read, as they must be, in conjunction with Mitchell's January 26, 1971 approval of the application for the January 29, 1971 order, as well as their supporting papers. The February 11, 1971 objectives approved by Mitchell thus authorized applications for authority to intercept within the statutory time limits all communications on the residential telephone service subscribed for by Fred Garnett which was provided for 855 Linden Boulevard. Application for the February 18, 1971 order to adjust the time limit on interceptions was thus embraced within the personal approval by Mitchell on February 11, 1971. *Fourth,* read together, Title III and the Fourth Amendment impose three basic requirements: (1) approval of all wiretap interception by a Justice Department official responsible to the political process prior to action by a federal judge, (2) findings of probable cause and necessity made by the judge, and (3) a Court order which is sufficiently specific in terms of the persons, crimes, places, method and time frame involved in order to prevent a general or exploratory search. Construing Attorney General Mitchell's February 11, 1971 action to authorize the announced intention by the government on February 18, 1971 to align the time frames of the interceptions, does not violate any of these requirements, nor are they violated by the February 18, 1971 order itself.

### (1) Single unit involved

As of January 14, 1971 when the government agents were preparing the application for the initial order their check of the records of the New York Bell Telephone Company revealed that private residential telephone service was installed to 855 Linden Boulevard, Brooklyn which had been subscribed for by Fred Garnett and to which the company had assigned the listing (212)342–6203. (Taylor Affidavits, January 28, 1971, para. 18, H617, H624; February 12, 1971, para. 8, H652, H654). This information appeared in the application presented to and authorized by Attorney General John Mitchell on January 26th and was reflected in the wiretap order issued by Judge Travia on January 29, 1971.

Apparently, as will shortly be indicated, Bynum learned of the pendency of the wiretap application and that an interception order would be issued thereon. On January 26th an oral request was made to the telephone company for the installation of additional residential service to 855 Linden Boulevard for the

same subscriber, Fred Garnett, with the request for an unlisted number assigned thereto. The additional service was installed on January 28th with the assigned number (212)346–5992. (Taylor Affidavit, February 12, 1971, para. 10, H652, H655). The existence of the second phone facility was indicated to the government agents on January 30th when two intercepted conversations on the first line referred to a second phone "downstairs". (Taylor Affidavit, February 12, 1971, paras. 9, 11, H652, H 654–55). Thereafter, 10 phone calls intercepted on the original line indicated the existence of the second line and Judge Travia was notified on February 4th that narcotics related phone calls were being diverted from the first to the second line into the premises (Taylor Affidavit, February 12, 1971, para. 11, H652, H655–56; Letter of AUSA Updike to Judge Travia, February 4, 1971, H635, H636).

Bynum testified at the trial that he had learned in advance of the January 29th order that the phone into 855 Linden Boulevard, (212)342–6203 would be tapped; this tip-off came from an employee inside the telephone company who was a friend of defendant Mae Garnett, one of the co-conspirators. (Bynum Cross-Examination, A2124–26; Redirect A2199–2200). It is a fair inference from the evidence and all the facts and circumstances herein and the Court finds that Bynum knew that a wiretap application had been presented by the government and that an order would be or had been issued to monitor his narcotic activities at 855 Linden Boulevard and that he caused the installation of the additional phone service to conceal those activities and to frustrate their interception and disclosure on the original line.

In this context, this Court finds as a fact that the two lines were in effect a single or common unit, essentially analogous to an extension telephone installed on the same wire with the same number, but located in a different room within the premises. *See* Steele v. United States No. 1, 267 U.S. 498, 45 S.Ct.

414, 69 L.Ed. 757 (1925) (warrant with description of garage for business purposes at No. 611 permitted search of No. 609 as well where both entrances were in the same building, there was no physical division of the building in half, and there was no division of the building in terms of use); United States v. Melancon, 462 F.2d 82 (5th Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972) (search warrant for No. 623 authorized search of 622 where both parcels were owned by the defendant, there was a clear path between them, and building described in warrant was located on parcel 622); United States v. Evans, 320 F.2d 482 (6th Cir. 1963) (two family building: search warrant for No. 1000 half of the building permitted search of the attic in No. 1004 half of the building where only Access to attic was by door cut through No. 1000 attic, access from No. 1004 having been permanently blocked off); Rodriguez v. State, 297 So.2d 15, 21 (Fla.1974) (dictum) (three separately authorized taps on three phones in the same home each listed in the name of a different resident might be considered to be a single tap, but in any event requisite minimization effort not shown). *See generally* People v. Ward, 508 P.2d 1257, 1259 (Colo.1973) (two separate warrants for two separate addresses in the same building issued on basis of affidavit showing common occupancy with probable cause not specifically referable to either address).

*(2) Tandem eavesdropping involved*

Similarly, the fact is that once the existence of the second telephone line was discovered the government intended to establish a tandem tap on the two lines so that interception of communications over both lines would proceed and terminate simultaneously. The government's original surveillance plan, duly approved and authorized by the Attorney General and the Court, contemplated tandem eavesdropping by means of an oral bug to be installed at 855 Linden Boulevard in conjunction with a wiretap on what was then believed to be the only line into

the premises. Use of such a tandem eavesdrop was expected to facilitate piercing what otherwise might appear to be innocent telephone conversations due to the use of code words. 360 F.Supp. at 405.

The initial time limit for both the wiretap and the oral bug under the January 29, 1971 order was the same—20 days. Under the February 12, 1971 order, the time limit for the wiretap on the second line was again similar—20 days from the date of the second order. The interception objectives as well as the wording of both the January 29, 1971 and February 12, 1971 orders were identical. (See Updike Affidavit, February 18, 1971, para. 7, H686, 688–89). AUSA Updike's February 16, 1971 report to Judge Travia (H676) indicated that an application was then being processed for an extension of the tap on the first line so that intercept authority for both lines would terminate on the same date. Thus throughout the period January 29, 1971 to March 3, 1971, the government's intent to simultaneously intercept and ultimately cease to intercept communications over both telephone lines is clear. The BNDD agents, as well as the Justice Department, were well aware of the interrelationship between the two lines and out of excessive caution believed that interception authority for both lines should be formalized and aligned. (*See, e. g.*, Taylor Affidavit, February 18, 1971, para. 11, H692, 698; Criminal Division Memo, February 18, 1971, PA6). In this context, a tandem wiretap was thus the only sensible way to proceed.

*(3) Mitchell's February 11, 1971 approval covered both listings*

Attorney General Mitchell's February 11, 1971 memo to Will Wilson (A122; PA11) indicating his approval of the application to be made to Judge Travia specifically mentions interception of oral communications (bug) and of wire communications into and out of a private residence at 855 Linden Boulevard in Brooklyn and gives the phone listing as (212)346–5992. However, since this Court has concluded that the two telephone listings involved in this case may be treated as a single or common unit and that the government intended throughout the investigation to maintain tandem eavesdropping, the specific reference to telephone listing (212)346–5992 in the memo cited above may be treated as unnecessary surplusage or merely immaterial omission of the other number for like phone service. *See, e. g.*, Nofs v. State, 295 So.2d 308, 309 (Fla.App. 2d Dist. 1974) (warrant identifying "westernmost apartment on the second story" of building authorized search of the entire apartment which turned out to be a duplex); United States v. Contee, 170 F.Supp. 26 (D.D.C.1959) (warrant specified "premises 810 C St. N.E. [entire Apt. A] Washington, D. C. Occupied by [X]" permitted search of X's apartment even though there was no "A" label on the door). *See generally* United States v. James, 494 F.2d 1007 (D.C. Cir. 1974), appeal pending, (with respect to determination of probable cause, agent's affidavit must be read in a common sense and realistic fashion). The remaining information concerning the means of interception, the location of the premises, and the persons and crimes involved sufficiently makes clear the scope of the application authority approved by Mitchell to be exercised by AUSA Updike and the BNDD. Application for the February 18, 1971 order was within the scope of that approval.

*(4) The purposes of Title III and the Fourth Amendment were safeguarded*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 was enacted following the Supreme Court's decisions in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (New York wiretapping statute unconstitutional) and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967) (warrant issued by a magistrate on a finding of probable cause required), which had both sticken

down the authority for electronic surveillance asserted in those cases. Congress was concerned with two potentially conflicting objectives: protecting personal privacy from the threat of invasion by increasingly sophisticated electronic eavesdropping devices while delineating constitutionally adequate procedures for employing such admittedly effective devices in combatting organized crime. United States v. Kahn, 415 U.S. 143, 151, 94 S.Ct. 977, 39 L.Ed. 225 (1974).

The constitutional warrant requirement provides two basic protections. First, based on the premise that any intrusion at all is an evil and that an element of necessity is therefore required as justification, review by a magistrate is intended to eliminate all searches not based on probable cause. Second, based on the premise that even necessary searches should be as limited as possible, the "specificity" or "particularity" requirement is intended to avoid the evil of the general warrant and the exploratory search. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971).

In the context of Title III, § 2518(3) which contains the probable cause requirements and § 2518(1) and (4) which list the descriptive elements which must be stated in the wiretap application and order, play the same role. As with the Fourth Amendment, specificity of person, time, place, method, and conversations to be "seized" is not a desideratum in itself, but rather only insofar as it protects persons from improper government intrusion. Just as the Fourth Amendment prohibits the general warrant abhorred by the colonists, Title III prohibits the "strategic intelligence surveillance" feared in our times. See United States v. Tortorello, 480 F.2d 764, 779 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Like the Fourth Amendment, Title III protects people not places.

Title III also added a significant safeguard of non-constitutional origin. Approval of all wiretap applications by the Attorney General or an Assistant Attorney General specially designated by the Attorney General for that purpose is required by § 2516(1) prior to submission of the applications to a judge. Section 2516(1) is intended to place the responsibility for the formulation of law enforcement policy on the use at the federal level of electronic surveillance in a publicly responsible office subject to the political process. Its companion provision, § 2518(1)(a) which requires that the application identify the official who has authorized interception of phone conversations, facilitates accountability should abuses occur. S.Rep.No.1097, 1968 U.S.Code Cong. & Admin.News, pp. 2185, 2189.

Section 2516(1), however, does not enumerate specific findings that the Attorney General must make in fulfilling his responsibility as opposed to § 2518 which enumerates the specific probable cause findings that a judge must make before issuing or extending the viable period of a wiretap order. It is clear that the Attorney General is not intended to simply append to the application his conclusion as to probable cause. It is the evidence from the investigating agents that the judge's determination of probable cause must rest upon, not the conclusions of the Attorney General. See United States v. Chavez, 416 U.S. 562, 574 n. 5, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). Rather the crucial function of review performed by the Attorney General is to assure that the statutory wiretap authority conferred by Title III will be used with restraint and will not be routinely invoked. United States v. Giordano, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Proper exercise of this review responsibility necessarily contemplates situations where the Attorney General would conclude that wiretapping would be improper even though a judge could properly find probable cause for granting intercept authority. Id., at 527–528, 94 S.Ct. 1820.

In light of all the circumstances, this Court concludes that the Attorney General's statutorily mandated review function of assuring that the use of electronic surveillance was justified in this case was properly fulfilled when he personally considered and authorized wiretap interception of conversations on the residential phone service at 855 Linden Boulevard.

■■■ There can be no question that the constitutional requirements were amply satisfied by the proof of probable cause and the sufficiency of the warrant (in this case Judge Travia's orders). While Courts have applied the probable cause requirement in a stringent fashion, with respect to the particularity requirement, a test of "practical accuracy rather than technical nicety" has been considered sufficient protection for personal rights. United States v. Gomez, 42 F.R.D. 347 (S.D.N.Y.1967). The underlying test is whether, given the specificity of the warrant, a violation of personal rights was likely, either through a general search directed toward the intended person or a search incorrectly directed toward a different and presumptively innocent person. *See* United States v. Melancon, 462 F.2d 82, 94 (5th Cir.), cert. denied, 409 U.S. 1038, 93 S. Ct. 516, 34 L.Ed.2d 487 (1972); Gomez, *supra*. Thus variations between the description in the warrant and the search actually conducted and the materials actually seized do not necessarily render the search and seizure invalid and require suppression.

■ The Fourth Amendment case law establishes that mistakes in numbering assume constitutional significance only when there is a danger that the privacy rights of third parties will be threatened or there is a danger of a general search. *Compare* United States v. Kaye, 139 U.S.App.D.C. 214, 432 F.2d 647 (1970) (search warrant to search No. 3618, a *business*, did not authorize search of 3618½, a second floor *residence* with separate entrance but part of same building leased in its entirety to defend-

ant) *with* United States v. Melancon, 462 F.2d 82 (5th Cir.), cert. denied, 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972) (search warrant for No. 623 authorized search of 622 when both parcels were owned by defendant, there was a clear path between them, and building described was on 622). The same principle is applied when the search warrant description actually covers only a part of the area to be searched, Steele v. United States No. 1, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925) (warrant with description garage for business purposes at No. 611· permitted search of No. 609 as well where both entrances were in the same building, there was no physical division of the building in half, and there was no division of the building in terms of use), and the knowledge of the enforcement agents may clarify an otherwise ambiguous warrant. United States v. Gomez, 42 F.R.D. 347 (S.D.N.Y.1967) (failure to specify which basement apartment of several located at specified address not fatal since agents knew which apartment they had observed).

■ The same approach governs with respect to the omission of information. While it is not the best practice to do so, omission from the warrant of the name of the owner of the premises involved does not necessarily render the search invalid if the premises are otherwise adequately described. *E. g.*, United States v. Fitzmaurice, 45 F.2d 133 (2d Cir. 1930); United States v. Kahn, 415 U.S. 143, 155 n. 15, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (dictum). Similarly the warrant need not state the name of the owner of a vehicle to be searched, although it is desirable to do so. Wangrow v. United States, 399 F.2d 106, 114–115 (8th Cir.), cert. denied, 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 (1968); E. Mascolo, Specificity Requirements for Warrants Under the Fourth Amendment: Defining the Zone of Privacy, 73 Dick.L.Rev. 1, 29 (1968). In the present case, while it would be desirable to have had both telephone list-

ings specified, an omission of one of the two does not raise the spectre of either a general or exploratory search or the invasion of the privacy of an innocent third party since each of the other descriptive elements is set forth in the order with sufficient specificity to remove any discretion on the part of BNDD agents in implementing the taps on both phones.

 Nor does the statute itself *require* that either the application or the order shall give the particular phone listings as long as other specific and unmistakable identifying information is provided of the manner and object of the search. Section 2518(1)(b)(ii) provides that the application shall include "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." Section 2518(4)(b) provides that the order shall specify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted.[5] To be sure, the particular telephone numbers are necessary as a mechanical matter to hook into the conversation to be intercepted, but translation of the information concerning the listed name and address into two telephone company service numbers by telephone company employees and BNDD

officials was simply an incidental ministerial act.[6]

Upon reconsideration of all the facts and circumstances and bearing in mind the teachings of *Giordano* and *Chavez*, this Court concludes and accordingly reports to the Court of Appeals, Second Circuit, that suppression of the intercepted communications and their investigative fruits is not required in this case.

The foregoing shall constitute the findings and conclusions required by Fed.R.Civ.P. 52(a).

So ordered.

---

5. S.Rep.No.1097 indicates that the application shall state "the place where, or the facilities or phone from which the communication is to be intercepted", 1968 U.S.Code Cong. & Admin.News, p. 2190, and that the order is required to specify "the phone or other communication facilities from which or the place where the authority to intercept is granted." *Id.*, at pp. 2191–2192. The phone in this case was Garnett's phone and the place was 855 Linden Boulevard in Brooklyn, while the users were Bynum and his co-conspirators.

6. Section 2518(4) provides in part:
An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to

accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates.
One of the BNDD informants who had been inside the premises at 855 Linden Boulevard indicated that the phone located there was being used for narcotics related communications, but did not know what the telephone number was. (Taylor Affidavit, January 28, 1971, para. 21, H617, H625). Surely a wiretap order issued on this basis with the actual listing subsequently supplied by the telephone company at the time of implementation would be valid.